Filed 11/4/14  P. v. Williams CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JOEL DERAY WILLIAMS,<br><br>　　　Defendant and Appellant. | A138964<br><br>(Contra Costa County<br>Super. Ct. No. 05-121821-3) |

Defendant Joel Deray Williams was convicted of pimping and other prostitution-related offenses following his assault on a woman who is referred to in the trial transcript as "Jane Doe."  Doe testified that defendant had encouraged her to work as a prostitute, insisted on taking the money she earned from that work, and eventually threatened her in order to compel her to continue working as a prostitute.  Defendant contends the trial court erred in admitting certain expert testimony and in sentencing him to consecutive prison terms on the three prostitution-related charges.  While we agree the trial court erred in permitting a police officer to give her opinion that defendant had a pimp, panderer, and human trafficking relationship with Doe, we find the error harmless under the particular circumstances of this prosecution.  We affirm defendant's convictions, conclude defendant was improperly punished for both pimping and pandering, and remand for resentencing on the pandering charge.

# I. BACKGROUND

Defendant was charged in an information, filed October 25, 2012, with human trafficking (Pen. Code,[1] § 236.1; count one), pimping (§ 266h, subd. (a); count two), pandering for prostitution (§ 266i, subd. (a); count three), and two counts of inflicting corporal injury on a spouse or cohabitant (§ 273.5, subd. (a); counts four & five). In a complaint filed the next day, he was also charged with possession of methamphetamine for sale. (Health & Saf. Code, § 11379.) The cases were consolidated prior to trial.

Defendant was arrested in May 2012, in the parking lot of Motel 6 in Concord when a police search of his person uncovered 18 pills of methamphetamine. At the time, Doe was in the passenger seat of his car. Three months later, Concord police arrested defendant again after responding to a report of domestic violence at a Best Western motel. When the police arrived, Doe told them she had been beaten by defendant on two recent occasions and showed them bruises consistent with her description of events. Police found eight cell phones and a laptop computer in defendant's hotel room, along with $943 in cash in his pants pocket.

Doe was the primary prosecution witness at trial. She was already working as a prostitute when she met defendant over the Internet around November 2011. What began as a romantic relationship with defendant quickly evolved into a working relationship, after defendant urged her to work as a prostitute to pay their living expenses. Thereafter, defendant required Doe to give him any money she earned from prostitution. Doe obtained her customers largely through a listing on a Web site. She worked with defendant to manage her marketing over the Web site, such as updating her listing and setting her rates. When Doe arranged to meet a customer at a particular location, defendant drove her to the location and waited. Defendant's job, in part, was to protect Doe from her customers, if that became necessary. In her first months of working with defendant, Doe estimated she had sexual relations with "[m]aybe 400" persons. According to Doe, defendant had a similar working relationship with two other women.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

At one point, when Doe told defendant she wanted to end their relationship, he induced the two other prostitutes to assault Doe to persuade her to remain.

Around April 2012, the nature of Doe's relationship with defendant changed, becoming "more businesslike." When Doe raised the issue of ending their association, defendant said she would be required to pay him $15,000 to $20,000. If she tried to leave without making the payment, defendant threatened, she would be killed by his colleagues at an entity known as "Thizz Nation." The prosecution introduced evidence of Internet communications between Doe and defendant in the course of their relationship and various items from defendant's computer that were generally consistent with Doe's testimony.

The other two women who Doe claimed worked as prostitutes with defendant also testified. Both acknowledged their personal relationships with defendant and their work as prostitutes, but they denied he was involved in that work, either as pimp or panderer. One of the women did, however, acknowledge giving Doe rides to motels or hotels at defendant's request.

The primary witness for the defense was defendant himself. Although he acknowledged his awareness of Doe's work as a prostitute, defendant said he did not promote or otherwise assist Doe's prostitution. He testified that his efforts to assist Doe's career were directed only at furthering her attempts to find work as a model and actor in pornographic films.

The prosecution presented expert testimony by Detective Amy Hendricks of the Concord Police Department in "the area of sexual exploitation, pimping, pandering, prostitution, human trafficking, as well as victim behavior." Hendricks explained the function of pimps in the business of prostitution and the typical role of pimps in prostitutes' personal lives. She distinguished between "gorilla pimps," who use aggression and violence to control the prostitutes working for them, and "Romeo pimps,"

3

who "groom" the prostitutes by maintaining an ostensibly romantic relationship with them.[2]

Toward the conclusion of Hendricks's testimony, the prosecutor asked her whether, based on her review of the police reports gathered during the investigation of defendant, Doe and defendant were in a "pimp/prostitute relationship." Hendricks opined that they were. She was then asked whether "the relationship between [defendant] and [Doe] is a pandering[/]prostitute relationship." Again she agreed. After explaining her understanding of the meaning of pimping and pandering and the distinction between them, she confirmed, "It is my opinion that [defendant] was acting as the pimp involved in their relationship." In response to the prosecutor's questions, Hendricks explained she reached the pimping conclusion on the basis of evidence of, among other things, Doe's engagement in commercial sex trade, the apparent "Romeo pimping" relationship between the two of them, Doe's payment of money she earned in the sex trade to defendant, their frequent use of motels, Doe's reporting of client information to defendant, and defendant's suggestion that Doe take clients to help pay their living expenses, among other factors. She then provided a similar explanation for her pandering opinion. Later, Hendricks was asked to distinguish human trafficking from prostitution. After some discussion, Hendricks was asked whether "the relationship between [Doe] and the defendant turned into a human trafficking relationship," and she confirmed that "it did." She explained the basis for her opinion, noting defendant appeared to have taken Doe's identification and had threatened her with violence, actually used violence, and demanded cash to end their relationship.

The trial court also allowed testimony from Brian Nehring, a federal Drug Enforcement Agency (DEA) agent, about Thizz Nation, the organization with which, Doe testified, defendant threatened her. Thizz Nation had produced and distributed a CD

---

[2] In the trial transcript, Hendricks's reference to the first type of pimp was transcribed by the court reporter as "guerrilla pimp." Because the detective's analogy appears to be to the behavior of the animal, rather than to a covert combatant, we have changed the spelling. (See *People v. Zambia* (2011) 51 Cal.4th 965, 971.)

4

featuring defendant's music, and defendant testified he had worked for the organization since 2004. Nehring testified that persons who "identify themselves as being members of the Thizz Nation" had come to the attention of the DEA as "drug dealers." According to Nehring, although Thizz Nation did run a legitimate music business, it was also "linked" to "drug dealing, pimping, assaults, shootings, murders, things of that nature." Reviewing a list of telephone numbers taken from one of defendant's cell phones, Nehring identified the telephone numbers of several persons connected to Thizz Nation who were associated with illegal drug sales.

Defendant was convicted of the charges of human trafficking, pimping, pandering, and transportation of methamphetamine. He was acquitted of both charges of inflicting corporal injury on a cohabitant, although he was found guilty of the lesser offense of battery on a cohabitant. Defendant was sentenced to the mitigated term of three years on the pimping charge, with two consecutive sentences of one year four months for the other prostitution-related charges. Sentences imposed on the battery and drug charges were to be served concurrently.

## II.  DISCUSSION

Defendant contends the trial court erred by admitting the testimony of Hendricks and Nehring and in sentencing him to consecutive prison terms on the three prostitution-related charges.

### A.  *Hendricks's Testimony*

#### 1.  *Opinion Testimony Regarding Defendant's Guilt*

Defendant first contends Detective Hendricks was permitted to offer impermissible opinions with respect to defendant's guilt.

Opinion testimony by an expert is admissible in a criminal prosecution "in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45.) An expert, however, "may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are

5

inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

A person is guilty of pimping if, knowing another person is a prostitute, he or she "lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution" or "solicits or receives compensation for soliciting for the person." (§ 266h, subd. (a); see *People v. McNulty* (1988) 202 Cal.App.3d 624, 630 ["section 266h can be violated in either of two basic ways: (1) by *deriving support* from the earnings of another's act of prostitution or (2) by *soliciting*"].) Pandering requires, in very general terms, "a defendant intend to persuade or otherwise influence the target 'to become a prostitute.' " (*People v. Zambia*, *supra*, 51 Cal.4th 965, 980; § 266i, subd. (a).) Human trafficking consists of "depriv[ing] or violat[ing] the personal liberty of another with the intent to obtain forced labor or services," including the commission of sex crimes. (§ 236.1, subds. (a), (b).)

We agree with defendant that Hendricks's testimony featured repeated improper expressions of opinion about defendant's guilt. Her testimony defendant was in a "pimp/prostitute relationship" and "pandering[/]prostitute relationship" with Doe and at some point this relationship evolved to a "human trafficking relationship" cannot be construed in any way other than as expressions of opinion about defendant's guilt on those charges. Her explanation of the basis for her conclusion that these relationships existed make clear that her intent was not merely to address the personal relationship between Doe and defendant, but rather to offer an opinion about the elements of the three crimes—in other words, that defendant was guilty of the crimes charged. We similarly agree with defendant that Hendricks's explanations for these opinions were, as defendant characterizes it, "a vehicle for a police officer to express her personal belief . . . that [defendant] was guilty of being a pimp." Her lengthy explanations could have sufficed for the prosecutor's closing argument.

6

The Attorney General argues Hendricks's testimony did not constitute an impermissible opinion on defendant's guilt because she "did not tell the jury that in her opinion [defendant] was guilty of the charges against him" and did not "express a general belief as to how the jury should decide the case." Rather, it is contended, she merely expressed the opinion that "the relationship between [defendant] and Doe was that of pimp and prostitute." The distinction the Attorney General draws is one without a difference. The crimes of which defendant was charged all involve a relationship—that is, conduct by the defendant with respect to an alleged prostitute. As a result, the prosecutor's characterization of the testimony as an expression of opinion about a "relationship," rather than an opinion directly about the elements of the crimes, does not change the nature of the testimony. The admission of Hendricks's expressions of opinion about defendant's role as pimp, panderer, and human trafficker and her explanation for those opinions was error.[3]

## 2. *Profile Testimony*

Defendant also contends Hendricks's testimony included inadmissible profile evidence.

"A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile. [Citations.] [¶] . . . [¶] . . . [P]rofile evidence does not describe a category of always-excluded evidence; rather, the evidence ordinarily is inadmissible 'only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.' [Citation.] In sum, '[p]rofile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as

---

[3] We note that Hendricks's testimony was far more extensive than the opinion evidence apparently disapproved in *People v. Leonard* (2014) 228 Cal.App.4th 465, in which the court held that testimony by a police officer that the defendant was acting as a " 'finesse pimp' " was improper because the jury was as qualified as the officer to determine whether the evidence showed conduct characteristic of the role. (*Id.* at p. 493.) *Leonard* also found admission of this testimony harmless. (*Ibid.*)

consistent with innocence as guilt.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1226 (*Prince*).)

We find no error in the admission of Hendricks's distinction between gorilla pimping and Romeo pimping and her other descriptions of typical pimping conduct, the testimony characterized by defendant as "profile evidence." It is true, of course, that the interpersonal relationships involved in gorilla pimping and Romeo pimping bear a resemblance to noncriminal human relationships. Hendricks did not, however, testify that a person who is involved in a violent, aggressive relationship with another is guilty of gorilla pimping, or that a person involved in a romantic relationship with another is guilty of Romeo pimping. Rather, she testified to these two personal relationships as ways in which a pimp manipulates the behavior of a prostitute. Because the elements of the crimes of pimping, pandering, and human trafficking, which are entirely separate from the particular personal relationship between the parties, must still be present, there was no risk that the jury would conclude from Hendricks's testimony that a noncriminal personal relationship would constitute a crime. That is, even if the jury found that defendant and Doe had a romantic relationship, it was still required to find, for the crime of pimping, that Doe was a prostitute, that defendant was aware she was a prostitute, and that he lived off the proceeds of her work or solicited for it. Because these additional elements are not present in noncriminal relationships, there was no risk that innocent and criminal conduct would be confused.[4] To the extent this was profile testimony, we find no error in the trial court's admission of it.

---

[4] Defendant places most reliance on *People v. Robbie* (2001) 92 Cal.App.4th 1075 (*Robbie*), which holds that profile evidence is "generally inadmissible to prove guilt" because it is used "to establish a stereotype, then condemn the defendant for fitting it." (*Id.* at pp. 1084, 1087.) *Robbie*'s characterization of profile evidence as "generally inadmissible" must be read in light of the later pronouncement of the Supreme Court in *Prince*, which expressly rejects that characterization and makes profile evidence subject to an ordinary analysis under Evidence Code section 352. (*Prince, supra*, 40 Cal.4th at p. 1226.)

8

### 3. *Common Experience*

Defendant contends Hendricks's testimony should have been excluded because the particular elements of the subject crimes—for example, living off income from or soliciting for a prostitute and encouraging prostitution—were not sufficiently beyond the experience of ordinary jurors to be a proper subject of expert testimony.

"[A]lthough expert testimony is generally inadmissible on topics 'so common' that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant. [Citation.] In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.) " 'That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] Rather, expert opinion testimony " 'will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." [Citation.]' [Citation.] 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Brown* (2014) 59 Cal.4th 86, 101.)

Defendant's focus on the individual elements of the crimes takes an insufficiently narrow view of the purposes for which expert testimony may be admitted. The general topic of prostitution and pimping is sufficiently beyond the experience of most jurors as to be a proper subject of expert testimony. Prostitution is an illicit business, and there are characteristic means adopted by the participants to accomplish that business. By describing those typical means, Hendricks allowed the jury to place the testimony of Doe and defendant in context. The trial court did not abuse its discretion in concluding such testimony would be helpful to the jury.

## 4. *Prejudice*

A trial court's evidentiary errors justify reversal of a defendant's conviction only if the evidence was prejudicial, that is, if there is a reasonable probability the jury would have reached a more favorable result in the absence of the evidence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 671.)[5] In evaluating prejudice here, we are mindful of the significance of Hendricks's improper opinion testimony. In effect, the prosecutor was permitted to present evidence that a police officer who was an expert in the crimes of pimping, pandering, and human trafficking had concluded defendant was guilty of those crimes. Yet we conclude the admission of the evidence was, in the end, not prejudicial.

It must be remembered that Hendricks, as she acknowledged, based her opinions about defendant's conduct on the information described in the police reports, which consisted largely of interviews with Doe and the other two prostitutes. The truly disputed issue at trial, however, was not whether defendant's conduct, as characterized by Doe to the police and in her testimony at trial, constituted pimping, pandering, and human trafficking. Once the type of activity constituting those crimes had been explained to the jury, it must have been clear that Doe's testimony described the classic commission of these crimes.

Rather, the true issue at trial was whether Doe was telling the truth. Defendant, who testified at length, and the two other prostitutes denied defendant's involvement in prostitution and provided innocent explanations for the various items of forensic evidence produced by the prosecution. The task for the jury was to decide which "side" to believe. With respect to this central issue, Hendricks was not asked to, and did not express any opinion. Further, because her knowledge was based solely on the police reports, she was in no position to express an opinion on Doe's credibility. Her testimony was therefore of

---

[5] We believe this standard, from *People v. Watson* (1956) 46 Cal.2d 818, is the appropriate one for prejudice in this case. We would reach the same conclusion, however, under the more stringent constitutional standard of *Chapman v. California* (1967) 386 U.S. 18. We reject defendant's claim that the testimony by the two experts violated his constitutional rights.

little help to the jury in resolving the primary issue before them, and it is not reasonably probable that her opinion testimony affected their resolution of the critical credibility issues. For that reason, we conclude that the trial court's error was not prejudicial.[6]

## B. *Nehring's Expert Testimony*

Defendant also argues the trial court should have excluded Nehring's testimony about the activity of persons associated with Thizz Nation under Evidence Code section 352. In overruling the objection, the trial court held the evidence "goes to the very core . . . in supporting the victim in that she didn't [work with defendant] freely, she did it because she had knowledge that the defendant had these connections, which made her fearful, that harm could come to her . . . . [¶] So the probative value is big. . . . And is that substantially outweighed by the probability that learning about Thizz Nation, which they've already heard, would confuse the jury? I don't think so. . . . Or possibly create substantial danger of undue prejudice? It is prejudicial. That's why it's so probative. It goes to the very heart of the case."

"Evidence Code section 352 provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.] '[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue

---

[6] Because we find the admission of Hendricks's testimony to have been harmless, by separate order filed this date in case No. A142040, we have denied defendant's petition for a writ of habeas corpus, which is premised on trial counsel's purported ineffective assistance in failing to object to the Hendricks testimony. (See *People v. Avila* (2014) 59 Cal.4th 496, 508 [claim of ineffective assistance requires showing of prejudice].) We note trial counsel appears to have objected adequately to Hendricks's testimony, and any purported failure to object played no role in our decision.

11

prejudice, confusion or consumption of time.  [Citation.]  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 270–271.)

We find no abuse of discretion in the trial court's decision to admit the evidence. Doe testified that defendant coerced her into continuing to work with him as a prostitute by threatening her with harm from persons associated with Thizz Nation.  Nehring's testimony was relevant because it demonstrated the threat was not necessarily an idle one and Doe's fear had some foundation.  The threat was central to the prosecution's proof of the charge of human trafficking, which requires evidence of "forced labor or services" (§ 236.1, subds. (a), (b)), and pandering, which requires influencing another to become a prostitute (§ 266i, subd. (a)).

Defendant contends Nehring's testimony was irrelevant because Doe was unaware of the specific instances of misconduct he discussed.  In fact, Doe testified that defendant told her those associated with Thizz Nation are "rappers, they're pimps, macs, and they're dealers. [¶] . . . [¶] . . . They sell ecstasy."  While she might not have been familiar with the specific instances discussed by Nehring, she was generally aware of bad conduct by Thizz Nation associates.  By demonstrating the truth of defendant's claims to Doe about the nature of Thizz Nation, Nehring's testimony demonstrated that his threats had substance, or at least could be viewed as having substance.  Given Doe's awareness of the general reputation of Thizz Nation for unlawful conduct, Doe's lack of awareness of the specific criminal acts cited by Nehring does not make the evidence irrelevant.

Defendant also argues the testimony was prejudicial because it associated him with a group of alleged criminals.  While we acknowledge the possibility of this type of prejudice, it was not necessarily "undue."  There was no contention defendant had been involved with these persons in the unlawful acts, and there was no attempt to imply his guilt on the prostitution charges through his association with Thizz Nation.  Rather, the evidence was presented solely to demonstrate his alleged threat could have been viewed

12

by Doe as having substance. This was not, in other words, an attempt to create guilt by association. (See *People v. Memory* (2010) 182 Cal.App.4th 835, 859–862.) Given the clear relevance of the evidence, we cannot say the trial court abused its discretion in concluding the probative value of the evidence outweighed any undue prejudice from this association.

## C. *Sentencing*

Defendant contends the trial court erred in sentencing him to separate terms on the three prostitution-related charges because all three constituted the same course of criminal conduct. We agree in part.

Subdivision (a) of section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." "The proscription against double punishment in section 654 is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute within the meaning of section 654. The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." (*People v. Bauer* (1969) 1 Cal.3d 368, 376.) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he [or she] may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551, fn. omitted.) "Section 654 in the sexual offense area means that the prohibition against double punishment will apply when one offense is committed as a means of committing another, facilitates commission of any other, or is incidental to commission of any other." (*People v. Roberson* (1988) 198 Cal.App.3d 860, 871 (*Roberson*).) When " 'section 654 prohibits multiple punishment, the trial court must

13

stay execution of sentence on the convictions for which multiple punishment is prohibited.' " (*People v. Sanders* (2012) 55 Cal.4th 731, 743 (*Sanders*).)

In *Roberson*, the defendant had been convicted of both procuring a minor for the purpose of committing lewd acts and aiding and abetting the commission of the lewd acts themselves. The court held that punishment could not be imposed for both crimes under section 654, explaining, "appellant's violation . . . in procuring [the victim] for lewd acts can be seen as facilitating the commission of those lewd acts by others in violation of section 288, subdivision (b). In fact the laborers would not have had the opportunity to commit those acts on [the victim] had appellant not provided [her] for them." (*Roberson, supra*, 198 Cal.App.3d at p. 871.) Somewhat similarly, in *People v. DeLoach* (1989) 207 Cal.App.3d 323 (*DeLoach*), the defendant recruited her daughter for compensated sex and was convicted of pandering, aiding and abetting sexual intercourse with a minor, and aiding and abetting forced oral copulation. (*Id.* at pp. 327–328.) The court held that the defendant could not be punished both for pandering and sexual intercourse with a minor since the objective of her pandering was to bring about that sexual intercourse. As the court held, "It is necessarily part of the aim, objective and intent of a panderer that the person who is the object of the pandering become a prostitute. Whether or not the latter actually goes on to become a prostitute or to perform acts of prostitution, it is indisputable that the panderer specifically intends and hopes that the person will do so. Thus, as a general rule, any acts of prostitution that follow directly or proximately from the pandering are incident to a single objective and therefore constitute an indivisible transaction with it; that is, the subsequent sex offenses are incidental to the commission of the pandering, and are facilitated by it." (*Id.* at p. 337.)

The same reasoning precludes defendant's punishment for both pandering and pimping. Because Doe was already a prostitute when defendant first committed pandering, his purpose was not to induce her to become a prostitute, but rather to create a role for himself in her ongoing activities—to become her pimp. Under the rule of *Roberson*, when one offense is "committed as a means of committing another, facilitates commission of any other, or is incidental to commission of any other," section 654

14

precludes multiple punishment. (*Roberson, supra*, 198 Cal.App.3d at p. 871.) Indeed, in *People v. Branch* (2010) 184 Cal.App.4th 516, the Attorney General conceded just this point in circumstances materially identical to those presented here. (*Id.* at p. 518.)

We do not reach the same conclusion with respect to the conviction for human trafficking. Pimping is distinct from human trafficking because the latter requires coercion. (§ 236.1, subds. (a), (b).) There is no evidence defendant coerced Doe at the beginning of their relationship. As the relationship continued, however, defendant sought by force to prevent Doe from leaving, first by having the other two women assault her and later by threatening her with the Thizz Nation. At the point at which defendant successfully coerced Doe, he began a new criminal transaction, with a different, more culpable objective.[7]

*DeLoach* provides guidance here. As noted above, the court held that a defendant could not be punished both for pandering and as an accomplice to the resulting voluntary sex acts. (*DeLoach, supra*, 207 Cal.App.3d at p. 337.) The defendant, however, had been convicted of forced oral copulation as well, on evidence that not all of her daughter's sex acts were consensual. The court refused to apply section 654 to preclude separate punishment for the charges of forced oral copulation. As the court held, "the *forcible* oral copulations . . . were different in kind. While a panderer's specific intent may be to cause another to become a prostitute, the aim of forcing someone to submit to sex acts against their will is not an element of pandering and is not necessarily or

---

[7] At oral argument, defendant's counsel argued incorrectly there was no evidence as to the timing of the second of these acts of coercion. The information charged that defendant committed pimping from "[o]n or about October 1, 2011 through March 31, 2012" and human trafficking from "[o]n or about April 1, 2012 through August 23, 2012." Doe testified the initial attempt at coercion occurred in January or February 2012. As to the later coercion, Doe testified defendant told her in June she would have to pay $15,000 or $20,000 to leave him, and she thought his first mention of violence by Thizz Nation occurred in July. The prosecution was not required to demonstrate the crime of human trafficking occurred precisely on the dates charged, but only " 'reasonably close' " to those dates. (*People v. Peyton* (2009) 176 Cal.App.4th 642, 660.) Given the distinct elements of pimping and human trafficking and the proven distinctions in time, there is no basis to sustain defendant's section 654 argument with respect to those two crimes.

15

generally intended by the panderer. Although acts of prostitution—sex for money —may be incidental to and indivisible from the specific objective of pandering, *forcible* sex acts are not. [¶] . . . The element of force or violence may, under the facts of a given case, render certain such criminal acts severable from the overall criminal transaction of which they are a part or during which they take place; such acts may, by virtue of their forcible or violent nature, constitute additional offenses for which additional or greater punishment may be given. [Citations.] [¶] . . . A defendant who attempts to gain money by aiding and abetting a number of base, forcible sex acts on his or her victim is substantially more culpable than a defendant who merely 'causes, induces, persuades or encourages another person to become a prostitute.' " (*DeLoach*, at p. 338.) For the same reason, the nature of defendant's crime changed when he began to force Doe to participate in prostitution. Thus, he can be punished separately on the charge of human trafficking.

In arguing for three separate crimes, the Attorney General divides defendant's pimping into three periods, arguing he can be punished for pimping on the basis of the initial relationship, for pandering after he caused the two women to assault Doe, and for human trafficking after he made the Thizz Nation threats. When characterized by the Attorney General in this manner, however, the acts constituting pandering are indistinguishable from the acts constituting human trafficking. The recruitment of the other women to assault Doe to compel her to remain a prostitute could as easily be characterized as a deprivation of her liberty under the human trafficking statute as defendant's later use of threats. The Attorney General argues the attack by the women and the threats constituted separate crimes because they occurred at different times, but pimping is an ongoing offense. (*People v. Lewis* (1978) 77 Cal.App.3d 455, 462.) With an ongoing offense, the prosecution cannot create multiple crimes merely by charging similar events occurring at different times during the course of the offense. (*Ibid.*) Under the Attorney General's view of defendant's crimes, multiple punishments for pandering and human trafficking would be precluded, leading to the same result. Accordingly, both

16

ways of viewing the crimes required the trial court to stay execution of the sentence for pandering.  (*Sanders, supra,* 55 Cal.4th at p. 743.)

## III.  DISPOSITION

Defendant's convictions are affirmed.  The matter is remanded to the trial court for resentencing on count three of the information, charging pandering for prostitution, consistent with this decision.

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Dondero, J.

17